## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**NOAH BEVERLY,**                                          **CASE NO. 2:05-cv-735**
                                                          **CRIM. NO. 2:99-cr-104(2)**
      **Petitioner,**                              **JUDGE GRAHAM**
                                                          **MAGISTRATE JUDGE KING**
**v.**

**UNITED STATES OF AMERICA,**

      **Respondent.**

## ORDER and
## REPORT AND RECOMMENDATION

Petitioner Noah Beverly, a federal prisoner, brings the instant motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. §2255.  This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that all of petitioner's claims, with the exception of his claim that his sentence violates *Blakely v. Washington,* 542 U.S. 296 (2004), be **DISMISSED**.  Respondent is **DIRECTED** to provide supplemental briefing on petitioner's *Blakely* claim within twenty (20) days of the date of this Order.

### I.  FACTS AND PROCEDURAL HISTORY

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of this case as follows:

> Noah Beverly, Douglas A. Turns, and Johnny P. Crockett were indicted for multiple crimes by a federal grand jury, charging them with conspiracy to commit armed bank robbery, in violation of 18 U.S.C. § 371, committing various armed bank robberies, in violation of 18 U.S.C. § 2113(a) and (d), and possessing firearms during and

in relation to these crimes of violence, in violation of 18 U.S.C. § 924©). After two evidentiary hearings, a jury trial commenced in which all three defendants were tried together. On February 8, 2000, the jury returned a verdict of guilty on all counts against Beverly and Turns. Crockett was found guilty of conspiracy to commit armed bank robbery, of robbing Security National Bank, and the Park National Bank in Hebron, Ohio, and of using a firearm in commission of those crimes, but was found not guilty of robbing two other banks with another defendant not involved in this appeal.

***

This case is about a series of bank robberies that occurred in Ohio between September 1994 and November 1995. Much of what happened was described by two men who testified at trial: Anthony Lavelle Rogers and his half-brother Melvin Warren, Jr.. In each of the seven robberies, either Rogers, Warren, or both, participated in the event and so testified to what occurred. Neither Rogers nor Warren are defendants in this case because they both entered into a plea agreement as part of a guilty plea to armed bank robbery.

### *Delaware County Bank and Trust*

According to Rogers's testimony at trial, on September 26, 1994, Rogers and Turns stole a Chevrolet Blazer from a trucking company and robbed the Delaware County Bank and Trust in Ashley, Ohio on the following day. Turns waited outside, feigning mechanical problems, while Rogers, having borrowed Turns's gun, went inside and robbed the bank. Rogers carried a silver pistol provided by Turns. After the robbery, the two drove to Columbus, Ohio where Turns's sister, Starla Turns, had a house. Rogers claimed he gave Turns $5,000 of the more than $70,000 he took from the vault.

Rogers was dating Starla and he was planning on leaving for Disney World with her the next day, so that night Rogers rented a hotel room near the Columbus airport. When Rogers realized that it would be unwise to attempt to take the gun on the airplane, he spoke with Turns about what he should do with it. Turns apparently suggested that Rogers leave it underneath the bushes near the hotel, where Turns could later recover it. Turns has a different version. According to the testimony of FBI Agent Harry Trombitas, Turns told him that

2

he, Turns, had found the gun in his car after having lent the vehicle to Rogers. Turns then informed Agent Trombitas about the weapon, and stashed it under some bushes by this same hotel while waiting for the FBI to come and pick it up. In Florida, while visiting Disney World, Rogers and Starla used various forms of false identification, which were allegedly provided to them by Turns.

Within ten days of the robbery, Lisa Dennis, Turns's girlfriend, made two round-number cash deposits to her bank account. The first deposit, made two days after the robbery, was for $500, and a week later, a second deposit of $600 was made. According to testimony presented at trial, neither Turns nor his girlfriend had a source of income that would explain these deposits. Turns's entire income during this period was apparently derived from unemployment benefits and his girlfriend, Dennis, was only receiving general assistance and funds from Aid to Dependant Children.

Eleven months later, Turns provided details of this robbery to the FBI, but denied his own involvement. Turns placed the amount stolen as between $70,000 and $80,000. The actual amount stolen was $72,500. Turns implicated Rogers, describing his disguise and noting that he had seen Rogers in a white Chevrolet Blazer with Kentucky license plates.

### Park National Bank in Kirkersville, Ohio

In December 1994, Rogers, his half-brother Melvin Warren, and Turns drove Warren's burgundy Cadillac to a Meijer shopping center in Columbus, Ohio, where Rogers stole a car. The theft was recorded by surveillance cameras. Turns, Rogers, and Warren drove to Kirkersville, Ohio. Rogers and Warren then took the stolen car and drove to the bank, while Turns waited with Warren's Cadillac at a nearby freeway on-ramp. Again, Turns feigned mechanical problems while Rogers and Warren robbed the Park National Bank, with Rogers using a gun he had gotten from Turns. Warren used a gun obtained from Beverly. After robbing the bank, Rogers and Warren drove the stolen car to the freeway on-ramp where they shifted into the Cadillac with Turns. Warren, directed by Turns, drove to Turns's brother's house, where the three counted their take and divided it into thirds.
Several weeks after the robbery, Warren and Rogers were stopped by the police and Rogers used Turns's driver's license as identification.

3

Though Rogers was released, a gun was recovered from the car and Warren was arrested. The ownership of the gun was traced back to Turns, who had purchased the weapon on September 9, 1993. This gun was allegedly provided to Rogers by Turns prior to the Park National Bank robbery.

Eight months after the December 30, 1994 robbery, Turns stated to the FBI that he had been at the aforementioned shopping center with the Meijer store that day with his brother and had happened to see Warren and Rogers there. Turns stated that Warren and Rogers told him details about the robbery later in the day, including the fact that they had taken approximately $35,000. The actual amount stolen was $31,377.

### National City Bank

Another bank robbery occurred five months later, on May 12, 1995, involving Warren, Beverly, and a third man named Colby. Warren testified that while the three of them were drinking at Beverly's house they decided to rob a bank. Warren, Beverly, and Colby parked at a nearby auto-parts store and walked into the National City Bank on Lockbourne Road in Columbus. Once in the bank, they began shouting for everyone to put their hands up. Beverly carried a revolver. The robbery netted $3,428. It was filmed by bank surveillance cameras. Warren identified Beverly as one of the robbers in the surveillance photographs shown at trial.

### Security National Bank

On May 18, 1995, Warren, Rogers, Beverly, and Crockett robbed the Security National Bank in Springfield, Ohio. The four met before the robbery at Beverly's apartment, where they prepared disguises, including masks and bandannas. They then drove together to Springfield in Warren's tan Lincoln Town Car. Once in Springfield, the four drove to a hospital, where Rogers stole a car to use as a getaway vehicle in the robbery. They found an alley behind some buildings across the street from the bank, where they parked the Lincoln. Rogers, Warren, Beverly, and Crockett entered the bank and Crockett, wearing a pair of pantyhose over his head, jumped over the teller's counter and ordered people to the floor. After robbing the bank, the four used the stolen car to get to the alley where the tan

4

Lincoln was parked. They all left their disguises in the stolen car, which was later recovered by the police. The four escaped with $10,538.47. During the robbery, bank surveillance cameras were working and took several photographs. Both Warren and Rogers were able to identify each other, as well as Beverly and Crockett, in the photos. The government contends that Beverly's pose, disguise, choice of weapon, and use of his left hand is almost identical in the May 18 and the May 12 robbery photos, and that Beverly's revolver, which appears in the pictures, had the same characteristics as the gun recovered after the November 22, 1995 robbery of the Park National Bank in Hebron, Ohio. The photographs also show a man, identified as Beverly, wearing a "Columbia" hat with holes cut in it as a mask. This hat was later recovered from the abandoned stolen car. It was a hair from this hat that was sent to the lab for the mitochondrial DNA test that was ultimately admitted into evidence at trial.

On July 24, 1995, two months after this robbery, Crockett purchased a 1984 Cadillac for $2,500. Yet, Crockett did not report any income for the year 1995. As part of the bank robbery investigation, FBI Agent Trombitas interviewed Crockett's wife, who identified her husband in the surveillance photo.

*First National Bank*

On July 28, 1995, Rogers, Warren and Turns drove to Zanesville in Turns's BMW. Once in Zanesville, the three drove to a grocery store where Rogers stole a Buick to use as a get-away vehicle. Rogers and Warren took the stolen car to the bank, while Turns drove to a nearby school, their pre-arranged meeting place, and waited. Rogers and Warren entered the bank, both armed. After getting the money, they returned to Turns's car and drove back to Columbus with $41,989. The get-away car was recovered by the police near a school. As it turns out, that same car had been reported stolen from the grocery store where the three had allegedly stopped. In addition, a local resident spotted the BMW near the school during the relevant time period. She identified the make and model, which matched a car that Turns had purchased on May 26, 1995 in Franklin County, Ohio for $5,450.

On the day before the robbery, the balance of the bank accounts of Lisa Dennis, Turns's girlfriend, totaled $24.34. However, her account later showed a deposit made three days after the First National Bank

robbery of exactly $1,000. Two days after the First National Bank robbery, Turns and Dennis met with a real-estate agent and put a $5,000 down payment on a house. On August 2, 1995, Turns and Rogers purchased a Porsche in Turns's name with $5,847.23 in cash. Neither Turns nor Dennis filed tax returns in 1994 or 1995.

In the summer of 1995, Turns and his brother went to a gun show with Rogers. They purchased several weapons there. Rogers testified to the fact it was their collective intention to use these weapons in future robberies.

*Huntington National Bank*

Only six days after robbing the First National Bank, on August 3, 1995, Rogers, Turns, and Warren robbed the Huntington National Bank in Marysville, Ohio. Turns drove them to Marysville in his BMW. Contrary to their usual practice, they did not steal a car to use as a get-away vehicle, but instead planned to steal a get-away car at the bank. Once there, Turns dropped the other two off in an alley near the bank and went to a pre-arranged place where they were to meet after the robbery. Rogers and Warren robbed the bank, stole a vehicle, and met Turns at the pre-arranged spot. They abandoned the stolen vehicle and drove back to Columbus with their take of $79,500. After the Huntington National Bank robbery there were more round-number deposits made to Lisa Dennis's account. Again, Turns described the robbery to the FBI in detail, without mentioning his involvement.

*Park National Bank in Hebron, Ohio*

On November 22, 1995, in Hebron, Ohio, Crockett and Warren robbed the Park National Bank. Crockett and Warren both had guns when they entered the bank and both were wearing disguises. Warren identified both himself and Crockett in the bank surveillance video. After finding dye packs in some of the money they had taken, Crockett began throwing the dye packs at the bank employees, who were lying on the floor. Crockett also fired a shot near the tellers. Crockett and Warren stole $30,577 from the Park National Bank. While Crockett was in the car waiting with the door open for Warren to come out of the bank, a car pulled into the bank parking lot. Crockett panicked and pulled away, leaving Warren without a means of escape. When Warren emerged from the bank and realized that Crockett had left, he stole a Cadillac.

6

> The chief of police saw the Cadillac pulling away from the bank and left in pursuit, but he ended up losing Warren in the car chase. Eventually, the stolen Cadillac was recovered. Inside the car, the police found some of the money stolen from the bank and a .22-caliber revolver. The revolver turned out to be the same type of gun used by Beverly in the May 12 and May 18 robberies. The police later recovered a .38-caliber bullet from the gun fired by Crockett at the tellers in the bank.
>
> Rogers and Warren were taken into custody by the FBI in August and December of 1995, respectively, partially as a result of information given to FBI Agent Trombitas by Turns. Rogers and Warren eventually cooperated with the FBI, and ultimately Turns, Beverly, and Crockett were indicted on July 20, 1999 and charged with conspiracy to commit armed bank robbery, committing various armed bank robberies, and for the possession of firearms during and in relation to these crimes of violence.

*United States v. Beverly*, 369 F.3d 516 (6th Cir. 2004).  Petitioner was sentenced to an aggregate term of 444 months incarceration.  Doc. No. 101.  Through counsel, petitioner filed a timely appeal.

> Beverly appeals the introduction of mitochondrial DNA (mtDNA) evidence against him at trial, arguing that the evidence was not scientifically reliable and, even if reliable, its probative value was outweighed by its prejudicial effect. In addition, Beverly joins the other defendants in bringing a *Batson* challenge, arguing that the district court committed clear error when it granted the government's peremptory challenge against an African-American who could have been seated on the jury panel.

*United States v. Beverly, supra.*  On May 12, 2004, the United States Court of Appeals for the Sixth Circuit affirmed the judgment of this Court.  *Id*.  On October 4, 2004, the United States Supreme Court denied petitioner's petition for a writ of *certiorari*.  Doc. No. 136.

On August 1, 2005, petitioner filed the instant motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255.  He asserts as follows:

1.  I was denied the effective assistance of counsel.

My counsel failed to have my trial severed from my co-defendants.

2.  I was denied effective assistance of counsel at trial because the evidence proved multiple conspiracies.

I was charged with one conspiracy, however, the evidence proved there were multiple conspiracies.  My counsel should have raised this at trial and requested a jury instruction regarding multiple conspiracies.

3. I was denied the effective assistance of counsel during my appellate proceedings.

My counsel failed to raise issues of severance, multiple conspiracies, pre-indictment delay and sufficiency of the evidence.

4.  My counsel was ineffective during the plea process.

My counsel did not pursue a plea agreement for me.  I would have pleaded guilty had an agreement been offered.

It is the position of the respondent that petitioner's claims are without merit.

## II.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to request a severance of his trial from that of his co-defendants in view of evidence that co-defendants Turns and Rogers robbed the Delaware County Bank on September 26, 1994, and that Turns, Rogers, and Warren robbed the Park National Bank in Kirkersville, Ohio on December 30, 1994, whereas petitioner did not rob the National City Bank until five months later, on May 12, 1995.  Petitioner argues that evidence regarding the earlier bank robberies unfairly prejudiced him and mandated a severance of trial proceedings. *Memorandum in Support of Petition*, at 7.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  The standard for reviewing a

claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

Petitioner's allegation that he was denied the effective assistance of counsel due to his attorney's failure to request a severance of trials is without merit.

> In general, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Defendants do not have a right to separate trials "simply because they have a better chance of acquittal if they [are] tried alone." *United States v. Breinig,* 70 F.3d 850, 853 (6th Cir.1995).

*Ross v. United States,* 339 F.3d 483, 493-94 (6th Cir. 2003).

> Notwithstanding the strong preference for joint trials, if a defendant or the government is prejudiced by joinder, Rule 14 permits the court to grant a severance or to "provide whatever other relief justice requires." Fed.R.Crim.P. 14. The rule leaves the determination of the risk of prejudice and appropriate remedy, if any, to the sound discretion of the trial judge. *Zafiro,* 506 U.S. at 540-41, 113 S.Ct. at 939; *United States v. Odom,* 13 F.3d 949, 958 (6th Cir.), *cert. denied,* 511 U.S. 1094, 114 S.Ct. 1859, 128 L.Ed.2d 481, *and cert. denied,* 513 U.S. 836, 115 S.Ct. 116, 130 L.Ed.2d 62 (1994). The district court's determination in this area is thus entitled to great deference....

> ... A mutually antagonistic defense is not prejudicial *per se,* and Rule 14 does not mandate severance on that ground as a matter of law. *Id.* at 535-39, 113 S.Ct. at 936-38. Rather, the appropriate standard to be used for evaluating a motion for severance once defendants have been properly joined under Rule 8(b), is that of "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539, 113 S.Ct. at 938; *see also Odom,* 13 F.3d at 958.

*United States v. Breinig*, 70 F.3d 850, 853 (6th Cir. 1995). As noted by respondent, co-defendant Turns requested a severance of trials, which request was denied. The United States Court of Appeals affirmed this Court's refusal to grant Turns' request for severance as follows:

> Rule 8(b) of the Federal Rules of Criminal Procedure permits two or more defendants to be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." All of the defendants committed bank robberies with Rogers and Warren during the course of the conspiracy and their testimony was admissible against all of the defendants, including Turns. The robberies were a series of offenses that were conducted over a relatively short period of time and performed using a similar pattern of behavior. The district court, therefore, did not err in joining the trial of Turns with that of Crockett and Beverly.

> Turns relies on *United States v. Hatcher,* 680 F.2d 438, 441 (6th Cir.1982), in which this court held that the joinder of two defendants was improper under Rule 8(b). In *Hatcher,* both defendants, Manetas and Hatcher, were jointly indicted for federal narcotics crimes. Although both defendants had been charged with three counts

10

relating to the possession and distribution of heroin, one of the defendants had also been charged with three counts relating to the possession and distribution of cocaine in an entirely unrelated series of offenses. This court held that since there was "no connection between Manetas and the cocaine-related charges against Hatcher," the joinder of the two defendants was improper. *Ibid.* The court further noted that "[t]he joinder of multiple defendants is proper under Rule 8(b) only if each of the counts of the indictment arises out of the same act or transaction or series of acts or transactions ⋯." *Ibid.*

The case before us now is distinguishable from *Hatcher,* because each bank robbery can easily be viewed as part of one ongoing set of transactions, linked together by Rogers and Warren. Furthermore, we have held that "a group of acts or transactions constitutes a 'series' if they are logically interrelated," and that a "group of acts or transactions is logically interrelated, for instance, if the acts or transactions are part of a common scheme or plan." *See United States v. Johnson,* 763 F.2d 773, 776 (1985) (noting that several other circuits have held similarly and citing *United States v. Corbin,* 734 F.2d 643, 649 (11th Cir.1984); *United States v. Cavale,* 688 F.2d 1098, 1106 (7th Cir.1982); *United States v. Ford,* 632 F.2d 1354, 1371-72 (9th Cir.1980)). Given the common scheme involved in this case, the district court did not abuse its discretion in joining Turns's trial with that of Beverly and Crockett, pursuant to Rule 8(b).

... [U]nder Rule 14 of the Federal Rules of Criminal Procedure[, s]everance of a joint trial is permitted, if joinder is prejudicial. Fed.R.Crim.P. 14; *see also United States v. Critton,* 43 F.3d 1089, 1097-98 (6th Cir.1995) ("Rule 14 allows for severance if it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants.") (internal quotation marks omitted). We review a denial of severance by the district court for a clear abuse of discretion. *United States v. Causey,* 834 F.2d 1277, 1287 (6th Cir.1987). Furthermore, a strong policy presumption exists in favor of joint trials when charges will be proved by the same evidence and result from the same acts. *See United States v. Hamilton,* 689 F.2d 1262, 1275 (6th Cir.1982).

Turns argues that his trial was prejudiced by being joined with the other defendants since the credibility of the testimony of Rogers and Warren, the government witnesses who placed Turns at the scene of the crime, was bolstered by additional pieces of incriminating and

corroborating evidence in the case against Beverly and Crockett. For example, in Crockett's case, the government presented a photograph taken during one of the bank robberies, which was purported to be of Crockett while he was in the process of robbing the bank. In Beverly's case, there was mtDNA evidence presented that linked Beverly to one of the robberies. These pieces of evidence corroborated the testimony given by Rogers and Crockett, although the evidence would have been inadmissible in a trial focused solely on Turns.

Turns's contention that Rogers's and Warren's testimony was bolstered during the trial by corroborating evidence presented in the case against Beverly and Crockett is unpersuasive. We have stated in *Causey,* 834 F.2d at 1288, that "a defendant is not entitled to severance simply because the evidence against a co-defendant is far more damaging than the evidence against him." Moreover, a defendant does not have a right to a separate trial, merely because his likelihood of acquittal would be greater if severance were granted. *See United States v. Gallo,* 763 F.2d 1504, 1526 (6th Cir.1985) (citing *United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.1978); *United States v. Larson,* 526 F.2d 256, 260 (5th Cir.1976)). "Absent a showing of substantial prejudice, spillover of evidence from one case to another does not require severance." *Ibid.* (citing *United States v. Ricco,* 549 F.2d 264, 270-71 (2d Cir.1977)). Turns has not made a showing of substantial prejudice in this case, and thus the district court did not abuse its discretion by denying Turns's motion for severance.

*United States v. Beverly*, *supra*, 369 F.3d at 533.  In view of the Court's denial of  Turns' request for a severance, and because "each bank robbery can easily be viewed as part of one ongoing set of transactions, linked together by Rogers and Warren," *see supra*, any request by petitioner for a severance of trials had little likelihood of success.  Petitioner has failed to establish that he was prejudiced by his attorney's failure to request a severance of trials.

[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice....

> Even if a defendant shows that particular errors of counsel were unreasonable ... the defendant must show that they actually had an adverse effect on the defense.
>
> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, *cf. United States v. Valenzuela-Bernal,* 458 U.S. 858, 866-867, 102 S.Ct. 3440, 3446-3447, 73 L.Ed.2d 1193 (1982), and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding....
>
> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland v. Washington, supra*, 466 U.S. at 693-94. Petitioner has failed to meet this standard.

Petitioner next asserts that he was denied the effective assistance of counsel because his attorney failed to request a judgment of acquittal on the conspiracy charge when the evidence established two conspiracies rather than the one, *i.e.*, one conspiracy among Turns, Rogers and Warren, and a second conspiracy among petitioner, Rogers, Turns and Warren.  *Petition,* at 8. Petitioner also asserts that he was denied the effective assistance of counsel because his attorney failed to request a jury instruction on multiple conspiracies.[1]  These claims also fail.

---

[1] An example of a jury instruction on multiple conspiracies would be as follows:

If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed.

If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though the defendant may have been a member of some other conspiracy.

*United States v. Robison,* 205 F.3d 1342, n. 3, unpublished, 2000 WL 191852 (6 Cir. Feb.11,

> The United States Supreme Court has held that "if an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby." *United States v. Warner,* 690 F.2d 545, 548 (6th Cir.1982) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings. "Whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury ... and [is] to be considered on appeal in the light most favorable to the government." *United States v. Schultz,* 855 F.2d 1217, 1222 (6th Cir.1988) (internal quotations omitted).

*United States v. Smith*, 320 F.3d 647, 652-53 (6th Cir. 2003).  The mere fact that petitioner did not personally participate in each of the bank robberies

> does not transform the scheme from a single conspiracy into multiple conspiracies. *See Warner,* 690 F.2d at 549 ("[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy."). To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal. *Id.* Knowledge of a single conspiracy may be proved by circumstantial evidence such as inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme. *United States v. Lee,* 991 F.2d 343, 348 (6th Cir.1993) (citing *United States v. Poulos,* 895 F.2d 1113, 1117 (6th Cir.1990)).

*Id*.  A single conspiracy is not converted into multiple conspiracies merely because there may be

some changes in persons involved or because they play different roles.  *United States v. Rugiero,*

---

2000).

14

20 F.3d 1387, 1391 (6 Cir.1994), citing *United States v. Rios,* 842 F.2d 868, 872 (6th Cir.1988);

*United States v. Bates,* 600 F.2d 505, 509 (5th Cir.1979).

> Each member of a conspiracy need not be shown to know each other
> or to have direct association with all other conspirators. *United States
> v. Sanchez,* 928 F.2d 1450, 1457 (6th Cir.1991) ···· [P]roof of a
> formal agreement is unnecessary. A tacit or mutual understanding
> and a showing of knowing and active participation by a defendant in
> some act or portion of the conspiracy is all that is required. *United
> States v. Lee,* 991 F.2d 343, 347-48 (6th Cir.1993). The fact that a
> conspiracy can be divided into distinctive sub-groups does not mean
> that there is more than one conspiracy. As long as the different sub-
> groups are committing acts in furtherance of one overall plan, the
> jury can still find a single, continuing conspiracy. *United States v.
> Warner,* 690 F.2d 545, 550 n. 8 (6th Cir.1982).

*United States v. Rugiero, supra*, 20 F.3d at 1391-92. Further, the record indicates that the jury was

properly instructed on the elements of the offense of conspiracy to commit armed bank robbery as

charged in count one of the indictment. Petitioner does not allege, nor does the record reveal, any

error in the jury instructions. Finally, as noted by the respondent, petitioner's sentence on count one

was ordered to run concurrently with the other sentences imposed.

Petitioner also asserts that he was denied the effective assistance of counsel during plea

negotiations. Petitioner asserts that his attorney failed to pursue a plea agreement, and never

"informed petitioner of a possible plea agreement." *Memorandum in Support of Petition*, at 13.

> [H]ad counsel explained the benefit of a possible plea agreement
> there is a reasonable probability that petitioner would have accepted
> the offer.

*Id.* In support of this claim, petitioner has attached his own affidavit which states:

> Mr. Cline represented me in all criminal proceedings. I swear that
> Mr. Cline never discussed the possibility of a plea agreement or the

15

benefit of plea[d]ing guilty as opposed to going to trial in connection with sentencing and a jury finding of guilty. I further swear that if Mr. Cline had informed me of a plea agreement in which I could have seen a reduction in sentence, I would have pleaded guilty.

*Affidavit of Noah Beverly.* In response to petitioner's allegation, respondent has attached an affidavit

from Richard A. Cline, petitioner's trial counsel, which states in relevant part:

I do recall plea negotiations with the United States and I further recall having detailed discussions with Mr. Beverly at which I explained that he could pursue a plea agreement with the United States. All of the discussions were oral, and I do not recall that the plea negotiations ever reached the level where a proposed plea agreement was drafted, because Mr. Beverly was consistent and adamant in his position that he did not commit the offenses charged in the indictment and would not plea guilty to any charges. I did find in my file a letter dated October 21, 1999 from Mr. Beverly to me in which Mr. Beverly makes reference to the fact that I had advised him to plead guilty in this case. In that letter Mr. Beverly made it clear that he did not intend, under any circumstances. To plead guilty as he was, in fact, not guilty of these offenses. A copy of that letter is enclosed.

I would also note that while Mr. Beverly was [awaiting] trial in federal court he was serving a sentence in the Ohio prison system. Accordingly, most of my contact with Mr. Beverly was via telephone calls. There were a couple of occasions when I visited him at the prison. One such visit related to the question of whether he should consent to a DNA sample so that the United States could attempt to either match or exclude him as a potential donor to a hair sample found after one of the bank robberies. I specifically recall that during our private conversation at that meeting I informed Mr. Beverly that I could still attempt to negotiate a plea agreement that would avoid a substantial amount of prison time because the United States has indicated a willingness to dismiss certain gun charges under 18 U.S.C. §924© in exchange for Mr. Beverly's cooperation against his co-defendants. Mr. Beverly informed me that he was not the person who had participated in these bank robberies, the hair found in the stocking cap after the bank robbery was not his hair, and that he wanted to go to trial to avoid an unjust conviction.

*Affidavit of Richard A. Cline.* Respondent has also attached petitioner's letter referred to by Cline

in his affidavit, which reads in pertinent part:

> Mr. Cline, based on the resulting conversation I had with my wife after your visit, it appears your advice is that I plead guilty to these charges.  If you, for whatever reason, feel that I committed these crimes and consequently find yourself unable to defend me to the fullest extent permitted by law, I would be deeply gratified if you would tell me so, so that I may ask the Court to appoint an attorney willing to fight, as I am, for my life.

> I have no intention of pleading guilty to crimes I did not commit, just because the prosecutor is willing to buy testimony against me from others willing to sell it because they, themselves, are in a legal bind. I know that's the way "justice" in Ohio works, but it is simple extortion and would render any such plea agreement void were everyone not careful to cover their tracks.

> But of course, they all will.  And I'll be left holding the conviction. No thanks.

> So, I inquire: have you filed any motions to get my indictment dismissed, or otherwise defend my interests? ....

> I am not in a position to know why these guys have chosen to finger me, other than prosecutorial pressure.  But the person in the mask is, rest assured, not me.  There cannot be a shred of credible evidence that links me to this crime because I wasn't there.

> The ONLY "evidence" they have is the unsubstantiated testimony of ex-felons who are obviously looking for some favor in return. Perhaps a motion seeking an investigator to assist you in finding out the reason for the availability of this fraudulent testimony is in order?

> Regardless, I want to assure you that I have absolutely no intention of pleading guilty to these crimes.  It is imperative that you respond as soon as possible as I must keep every possible option open to me.

*See Exhibits* to Return of Writ.

17

>Defendants have a constitutional right to effective assistance of counsel during plea negotiations. *Hill v. Lockhart,* 474 U.S. 52, 58-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The two-prong ineffective assistance of counsel analysis that the Supreme Court announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to claims that counsel's performance was constitutionally deficient during plea negotiations. *Hill,* 474 U.S. at 58, 106 S.Ct. 366. A petitioner who claims that he was denied effective assistance of counsel with regard to whether or not to plead guilty must prove that (1) counsel rendered constitutionally deficient performance, and (2) there is a reasonable probability that but for counsel's deficient performance, the petitioner would have pled guilty. *Magana v. Hofbauer,* 263 F.3d 542, 547- 48 (6th Cir.2001) (citing *Turner v. Tennessee,* 858 F.2d 1201, 1206 (6th Cir.1988)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

*Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005). Petitioner has failed to meet this standard. The Constitution does not require that an attorney insist that his client accept a plea offer in view of overwhelming evidence of guilt. *Smith v. United States,* 348 F.3d 545, 552 (6th Cir. 2003).

>The decision to plead guilty--first, last, and always--rests with the defendant, not his lawyer. Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.

*Id.* Further, petitioner's current assertion that he would have accepted a plea offer is simply unworthy of credit in view of counsel's affidavit to the contrary, and petitioner's own letter explicitly states that he is not interested in accepting any plea because he is innocent. The record reflects that refusing his counsel's suggestion of a guilty plea pursuant to a plea agreement. The fact that petitioner may now regret his decision will not provide a basis for relief.

18

Petitioner also asserts that he was denied the effective assistance of counsel during sentencing proceedings because his attorney failed to challenge the five level increase in his recommended guideline sentence under §2B3.1(b)(2)©[2] for his use of a firearm in the bank robbery charged in connection with the conspiracy conviction. *See Presentence Investigation Report*, at ¶65. Petitioner asserts that this firearm enhancement constituted impermissible double counting, since he was also convicted of firearms violations under 18 U.S.C. §924©). Petitioner's argument is unavailing.

Application Note 4 to §2K2.4 of the United States Sentencing Guidelines, the provision governing applicable offense conduct for firearms offenses, provides in relevant part:

> 4. Weapon Enhancement.--If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the

---

[2] U.S.S.G. §2B3.1 provides:

§ 2B3.1. Robbery

(a) Base Offense Level: 20

(b) Specific Offense Characteristics

(1) If the property of a financial institution or post office was taken, or if the taking of such property was an object of the offense, increase by 2 levels.

(2) (A) If a firearm was discharged, increase by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished, or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished, or possessed, increase by 3 levels; or (F) if a threat of death was made, increase by 2 levels.

19

defendant is accountable under 1.3 (Relevant Conduct). Do not apply any weapon enhancement in the guideline for the underlying offense, for example, if (A) a co-defendant, as part of the jointly undertaken criminal activity, possessed a firearm different from the one for which the defendant was convicted under 18 U.S.C. 924©); or (B) in an ongoing drug trafficking offense, the defendant possessed a firearm other than the one for which the defendant was convicted under 18 U.S.C. 924©). However, if a defendant is convicted of two armed bank robberies, but is convicted under 18 U.S.C. 924©) in connection with only one of the robberies, a weapon enhancement would apply to the bank robbery which was not the basis for the 18 U.S.C. 924©) conviction.

Thus, under the sentencing guidelines,

"impermissible 'double counting' occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United States v. Farrow,* 198 F.3d 179, 193 (6th Cir.1999) (citing *United States v. Perkins*, 89 F.3d 303, 310 (6th Cir.1996)).

*United States v. Smith,* 320 F.3d 647, 657 (6th Cir. 2003).  That is not the circumstance in this case.

Petitioner received a five level enhancement under §2B3.1(b)(2)©) for his use of a firearm in connection with the conspiracy charged in count one, *Presentence Investigation Report*, at ¶65. However, petitioner's conviction on the charge of conspiracy to commit armed bank robbery in count one of the indictment, included as an overt act, petitioner's armed robbery of the Charter One Bank in Toledo, Ohio, on May 31, 1995, which offense was not charged as a separate, substantive, count of the indictment.  Petitioner was not charged under 18 U.S.C. §924©) for the use of a firearm in the May 31, 1995, armed bank robbery of Charter One Bank.  See Doc. No. 1.  Thus, no impermissible double counting occurred as a result of the five level enhancement for his use of a firearm on his conviction for conspiracy to commit armed bank robbery.  *See United States v. Bowman*, 215 F.3d 951, 968 (9th Cir. 2000); *United States v. McCarthy,* 77 F.3d 522, 536-37 (1st Cir.

1996).  Petitioner has failed to establish the ineffective assistance of counsel due to his attorney's failure to object to the five level enhancement of petitioner's sentence under §2B3.1(b)(2)©).

Lastly, petitioner asserts that his sentence violates *Booker v. Washington*, 542 U.S. 296 (2004).  *Memorandum in Support of Petition*, at 17-18.  Neither *Booker* nor *Blakely v. Washington, supra,* are retroactively applicable to cases on collateral review.  *Humphress v. United States, supra,* 398 F.3d at 860-63.   Here, petitioner's conviction became final on October 4, 2004, when the United States Supreme Court denied his petition for a writ of *certiorari*.  *See* Doc. No. 136.  Thus, *Booker* is not applicable to petitioner's sentence.  *Humphress v. United States*, *supra.*  However, *Blakely v. Washington, supra,* 542 U.S. at 296, issued on June 24, 2004, is applicable.

Respondent has not addressed petitioner's allegation that his sentence violates *Blakely*. Respondent therefore is **DIRECTED** to provide supplemental briefing regarding that issue within twenty (20) days of the date of this order.

## II.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner also asserts that he was denied the effective assistance of appellate counsel because his attorney failed to argue on appeal that his trial should have been severed from that of the co-defendants; that the evidence established not one but multiple conspiracies and that there was insufficient evidence to establish the conspiracy that was charged; and that petitioner was denied a fair trial due to excessive pre-indictment delay.

The *Strickland* test applies to appellate counsel.  *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  "'[W]innowing out weaker arguments on appeal and focusing on'

those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes*, 463 U.S. 745, 751-52.

For the reasons discussed, *supra*, petitioner's allegations that his trial should have been severed from that of the co-defendants, and that the evidence established only multiple conspiracies are without merit.  Petitioner has therefore failed to establish the ineffective assistance of counsel due to his attorney's failure to raise these issues on direct appeal.

Petitioner also asserts that his attorney should have raised on appeal an issue regarding excessive pre-indictment delay, because

> [t]he last bank robbery that was charged in [the] indictment occurred on November 22, 1995.  This robbery allegedly involved Crockett and Warren.  Rogers and Warren were taken into custody in August and December of 1995 respectively.  Rogers and Warren cooperated with the FBI, yet petitioner and his co-defendants were not indicted until July 20, 1999.

*Memorandum in Support of Petition*, at 12.  This claim is also without merit.

> While the acceptability of a pre-indictment delay is generally measured by the applicable statute of limitations, the Fifth Amendment also imposes due process restraints on the length of a pre-indictment delay. *See United States v. Atisha,* 804 F.2d 920, 928 (6th Cir.1986). In assessing claims of pre-indictment delay, this court applies the two-part test set forth in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). *See United States v. Brown,* 959 F.2d 63, 66 (6th Cir.1992). A defendant must demonstrate that (1) he suffered substantial prejudice to his right to a fair trial as a result of the delay; and (2) the government purposely delayed in order to gain a tactical advantage over the defendant. *See Brown,* 959 F.2d at 66.

*Monzo v. Edwards,* 281 F.3d 568, 581 (6th Cir. 2002).  Petitioner has failed to establish either of

these foregoing factors.  He has therefore failed to establish the ineffective assistance of appellate counsel due to his attorney's failure to raise on direct appeal an issue relating to pre-indictment delay.

For all the foregoing reasons, the Magistrate Judge **RECOMMEND**S that all of petitioner's claims, with the exception of his claim that his sentence violates *Blakely,* be **DISMISSED.** Respondent is **ORDERED** to provide supplemental briefing regarding petitioner's *Blakely* claim within twenty (20) days of the date of this order.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

September 19, 2006                                           *s/Norah McCann King*

                                                            Norah McCann King

United States Magistrate Judge